**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE ALBANY CONDOMINIUM ASSOCIATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 24-cv-10852 |
| v. | ) ) | Judge Andrea R. Wood |
| REPUBLIC SERVICES, INC., et al., | ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant Republic Services, Inc. ("Republic") is a company whose wholly-owned subsidiaries provide solid waste disposal services throughout the United States. One of Republic's subsidiaries, Defendant Allied Waste Transportation, Inc. ("AWT"), serves customers in Illinois, including Plaintiffs Albany Condominium Association and Hermitage of Ravenswood Condominium Association. Another subsidiary, Defendant BFI Waste Services of Texas, LP ("BFI"), serves customers in Texas, including Plaintiff JD Feldman Properties, LLC ("JD Feldman"). According to Plaintiffs, Defendants operate as a single organization to impose on their customers unauthorized and unlawful rate increases and fees. For that reason, Plaintiffs have brought the present action on behalf of themselves and putative classes of customers in Illinois and Texas, asserting state-law claims for breach of contract, unjust enrichment, and common-law fraud, as well as claims for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* Now, Defendants move to dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Dkt. No. 23.) For the reasons that follow, Defendants' motion is granted in part and denied in part.

## BACKGROUND

As alleged in the Amended Class Action Complaint ("ACAC"), Republic is a solid waste disposal company that services customers throughout the United States. (ACAC ¶¶ 2, 26, Dkt. No. 27.) Republic itself does not contract with customers to provide solid waste disposal services; instead, it relies on its many wholly-owned subsidiaries to contract with customers in the various locations it serves. (*Id.* ¶¶ 7, 18.) Relevant here, AWT is the subsidiary that ostensibly serves customers in Illinois, and BFI is the subsidiary that serves customers in Texas. (*Id.* ¶¶ 7, 59.) Republic, AWT, and BFI are all entities formed in Delaware with their principal places of business in Arizona.[1] (*Id.* ¶ 15.) Notwithstanding their formally separate corporate identities, Plaintiffs allege that Republic disregards the legal separateness of AWT, BFI, and its other wholly-owned subsidiaries, and so dominates their affairs as to render the subsidiaries mere alter egos of Republic. (*Id.* ¶¶ 9, 16–25.) Thus, Plaintiffs claim that Republic and its subsidiaries effectively operate as a single organization and should be regarded as such. (*Id.*)

According to Plaintiffs, Defendants contract with their customers using substantively identical standardized form agreements. (*Id.* ¶¶ 27, 30.) Republic is responsible for drafting the standardized language and terms used in those contracts. (*Id.* ¶ 19.) The contracts set a fixed rate at which Defendants charge customers for solid waste disposal services and also contain a term that purports to limit Defendants' ability to increase that rate. (*Id.* ¶¶ 27, 30.) Specifically, the contracts provide as follows:

> Company may, from time to time by notice to Customer, increase the rates provided in this Agreement to adjust for any increase in (a) disposal costs; (b) transportation

---

[1] Whereas Republic and AWT are corporations, BFI is a limited partnership and thus its citizenship is determined by reference to the citizenships of its partners. *E.g.*, *Guar. Nat'l Title Co. v. JEG Assocs.*, 101 F.3d 57, 58 (7th Cir. 1996). But because BFI's two partners are Delaware corporations with their principal places of business in Arizona, just like Republic and AWT (Joint Initial Status Report § 1(C)(ii)(b), Dkt. No. 16), BFI is also a citizen of those two States.

costs due to a change in location of Customer or the disposal or recycling facility used by Company; (c) the Consumer Price Index for all Urban Consumers (Water, Sewer and Trash Collection Services), U.S. City Average; (d) the average weight per cubic yard of Customers Waste Materials; (e) recycling sorting [*sic*], processing and related costs; (f) costs related to Customer's failure to separate Recyclable Materials from other Waste Materials, or (g) Company's costs due to changes in Applicable Laws. Company may increase rates for reasons other than those set forth above with Customer's consent, which may be evidenced verbally, in writing or by the parties' actions and practices.

(*Id.* ¶ 31.) Stated succinctly, this provision ("Rate Adjustment Provision") permits Defendants to increase a customer's rates only to account for increases in specific discrete costs or the Consumer Price Index ("CPI"), and otherwise requires Defendants to obtain a customer's consent to increase rates for a non-listed reason. (*Id.* ¶¶ 2, 31–32.) In addition, Defendants' contracts contain standardized provisions locking their customers into an initial 36-month term and allowing Defendants to impose punitive measures against customers who seek early termination of the agreement or fail to make timely payment of amounts due. (*Id.* ¶ 34.)

According to Plaintiffs, during the terms of their contracts, Defendants have implemented rate increases through its Yield Management Process ("YMP Rate Increases") that far outpace increases to the CPI and the other listed costs in the Rate Adjustment Provision. (*Id.* ¶¶ 27–28, 33.) Moreover, Defendants did not seek Plaintiffs' written or verbal consent for the increases. (*Id.* ¶¶ 31 n.12, 39.) Instead, the YMP Rate Increases are determined by a single algorithm and their sole purpose is to boost Defendants' profits by extracting additional, unearned payments from their customers. (*Id.* ¶¶ 19, 28, 37.) Defendants do not disclose to their customers any information about how the YMP Rate Increases were calculated or the purpose for which they were imposed. (*Id.* ¶¶ 39–40.) Over the term of its contract, a customer may see its rate double as a result of Defendants' YMP Rate Increases. (*Id.* ¶ 37.)

Another way Plaintiffs contend that Defendants reap unearned profits is by charging customers a "Fuel Recovery Fee" and an "Environmental Recovery Fee" (collectively, "Fees")—

billed together as a "Fuel/Environmental Recovery Fee." (*Id.* ¶ 41.) Defendants' label suggests that the two Fees cover the increased fuel and environmental costs Defendants incur in providing their services. (*Id.*) In reality, however, neither Fee has any connection to its stated purpose or otherwise offsets increases in Defendants' costs. (*Id.* ¶¶ 42–45.) Both Fees are simply another means by which Defendants increase their profits. (*Id.* ¶ 46.) As with the YMP Rate Increases, Defendants do not disclose to their customers their methodology in determining the Fees. (*Id.*)

Because they claim that Defendants impose the YMP Rate Increases and the Fees without contractual authorization and without full disclosure of their true purpose, Plaintiffs have brought the present action on behalf of themselves and putative classes of Defendants' customers in Illinois and Texas. Plaintiffs Albany Condominium Association and Hermitage of Ravenswood Condominium Association are two Illinois-based customers that contracted with Republic's subsidiary AWT for solid waste disposal services. (*Id.* ¶¶ 7, 11–12.) And Plaintiff JD Feldman is a Texas-based customer that contracted with the Republic subsidiary BFI. (*Id.* ¶¶ 13, 59.) Plaintiffs propose to represent the following classes:

> **The Illinois Rate Increase Class:** All entities and people who reside in Illinois who entered into a Rate Adjustments provision that allows for increases to "adjust for" increases in costs or CPI and, from January 1, 2017 through the date of class notice, paid rates to [Defendants] in excess of those originally listed in the written contract as a result of [Defendants'] YMP policy.

> **The Texas Rate Increase Class:** All entities and people who reside in Texas who entered into a Rate Adjustments provision that allows for increases to "adjust for" increases in costs or CPI and, from January 1, 2017 through the date of class notice, paid rates to [Defendants] in excess of those originally listed in the written contract as a result of [Defendants'] YMP policy.

> **The Illinois Fees Class:** All entities and people who reside in Illinois who entered into a Rate Adjustments provision that allows for increases to "adjust for" increases in costs or CPI and, from January 1, 2017 through the date of class notice, paid Fuel Recovery Fees and/or Environmental Recovery Fees to [Defendants].

> **The Texas Fees Class:** All entities and people who reside in Texas who entered into a Rate Adjustments provision that allows for increases to "adjust for" increases

in costs or CPI and, from January 1, 2017 through the date of class notice, paid Fuel Recovery Fees and/or Environmental Recovery Fees to [Defendants].

(*Id.* ¶ 56.)

The seven-count ACAC includes state-law claims on behalf of one or more of the classes. Counts I through III set forth claims on behalf of the Illinois and Texas Rate Increase Classes, with Count I asserting a claim for breach of contract, Count II asserting a claim for breach of the duty of good faith and fair dealing, and Count III asserting a claim for unjust enrichment. Counts IV and V consist of ICFA claims brought on behalf of the Illinois Rate Increase Class and the Illinois Fees Class, respectively. Count VI asserts another unjust enrichment claim—this one on behalf of the Illinois and Texas Fees Classes. Finally, Count VII sets forth on behalf of all four classes a claim for fraud in the inducement.

## DISCUSSION

Defendants seek dismissal of the ACAC in its entirety. First, they contend that the Court must dismiss all claims brought by Texas-based JD Feldman ("Texas Claims") for lack of personal jurisdiction. Then, Defendants argue that the remaining claims must be dismissed for failure to state a claim.

### I. Personal Jurisdiction—Texas Claims

Because JD Feldman is a Texas resident and none of its claims against Defendants have any relationship with Illinois, Defendants contend that this Court lacks personal jurisdiction over them with respect to the Texas Claims.

A motion to dismiss under Rule 12(b)(2) "tests whether a federal court has personal jurisdiction over a defendant." *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1045 (N.D. Ill. 2015). "The plaintiff need not include facts alleging personal jurisdiction in the complaint, but once the defendant moves to dismiss the complaint . . . for lack of personal jurisdiction, the

plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (internal quotation marks omitted). When a court considers a Rule 12(b)(2) motion based on the parties' submission of written materials without holding an evidentiary hearing, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (internal quotation marks omitted). In that circumstance, any well-pleaded facts alleged in the complaint are taken as true and any factual disputes in the affidavits are resolved in the plaintiff's favor. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

Because it is sitting in diversity, the Court looks to Illinois's long-arm statute to determine whether Defendants are subject to personal jurisdiction in the State. *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). The long-arm statute allows for the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause. 735 ILCS 5/2-209(c); *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Thus, the question before the Court is whether Defendants have, as to the Texas Claims, "sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo*, 601 F.3d at 700–01 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction can be general or specific. "A defendant is subject to general jurisdiction when it has 'continuous and systematic general business contacts' with the forum state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984)). In such a case, the defendant "can be sued in the forum state for any cause of action arising in any place." *Id.* However, the standard for general jurisdiction is demanding and "requires the defendant to

have such extensive contacts with the state that it can be treated as present in the state for essentially all purposes." *Id.* at 426. Typically, a corporation is subject to general jurisdiction in its place of incorporation or principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Here, no Defendant is incorporated in Illinois or has its principal place of business in this State. (ACAC ¶ 15.) While the ACAC nonetheless alleges that Defendants are subject to general jurisdiction in Illinois, Plaintiffs do not argue that general jurisdiction is appropriate in their response to the motion to dismiss. Thus, the Court finds that Plaintiffs have failed to establish a *prima facie* case for the exercise of general jurisdiction over Defendants.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Thus, "the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction." *Tamburo*, 601 F.3d at 702. The Court may exercise specific jurisdiction where "(1) the defendant has purposefully directed [its] activities at the forum state or purposefully availed [itself] of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* In addition, the exercise of jurisdiction "must also comport with traditional notions of fair play and substantial justice." *Id.*

Here, Plaintiffs contend that the Court can exercise specific jurisdiction over Defendants as to the Texas Claims because Republic's subsidiaries BFI and AWT are alter egos of Republic such that they are indistinguishable from Republic notwithstanding their separate corporate

identities. According to Plaintiffs, because Defendants effectively form a single Republic entity, AWT's undisputed contacts with Illinois are imputed to Republic and BFI, and establish personal jurisdiction over all three Defendants. But "[t]ypically, jurisdiction over a subsidiary is not sufficient to confer jurisdiction over an out-of-state parent, even assuming the parent exerts some degree of control over the subsidiary." *Hub Grp., Inc. v. Go Hub Grp. Holdings, Corp.*, No. 19-cv-7648, 2021 WL 4264349, at *6 (N.D. Ill. Sept. 20, 2021) (internal quotation marks omitted). Nonetheless, in certain circumstances, a parent may be found to "utilize[] its subsidiary in such a way that the parent has greater control over the subsidiary than normally associated with common ownership and directorship or where the subsidiary is merely an empty shell," such that the "contacts of a subsidiary [will be] aggregated with the contacts of the parent." *Schoeps v. Sompo Holdings, Inc.*, 736 F. Supp. 3d 582, 597 (N.D. Ill. 2024) (quoting *Purdue Rsch. Found.*, 338 F.3d 773, 788 n.17 (7th Cir. 2003)).

Plaintiffs introduce evidence and argue at great length about how that evidence establishes that Defendants are alter egos of each another. But even though Defendants dispute that Republic's subsidiaries are its alter egos, they assume for purposes of the present motion that AWT's Illinois contacts can be imputed to Republic under an alter ego theory (and, accordingly, they do not challenge the Court's personal jurisdiction over Republic with respect to the Illinois Plaintiffs' claims). For that reason, this Court need not engage with Plaintiffs' evidentiary submissions directed toward establishing that Defendants form a single entity. Rather, the Court accepts for present purposes that Defendants form a single entity but nonetheless concludes that it lacks personal jurisdiction over the Texas Claims.

In assessing whether it can exercise specific jurisdiction, "the Court must consider the scope of personal jurisdiction with respect to each of the claims alleged in the plaintiff's

complaint." *Sunny Handicraft (H.K.) Ltd. v. Edwards*, No. 16 C 4025, 2017 WL 1049842, at *4 (N.D. Ill. Mar. 20, 2017). In multi-plaintiff cases, such an individual claim analysis considers the defendant's suit-related contacts not as to the plaintiffs collectively but rather with respect to each individual plaintiff's claims. *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 164 F. Supp. 3d 1040, 1047 (N.D. Ill. 2016) ("[T]he specific personal jurisdiction inquiry in this case must be conducted separately for the claims of each individual plaintiff."). The Supreme Court has explained that "a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction" over a nonresident plaintiff's claims, even where the third party is a resident plaintiff who "can bring claims similar to those brought by the nonresidents." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 265 (2017) (internal quotation marks omitted).[2] Thus, "a state may not assert specific jurisdiction over a nonresident's claim where the connection to the state is based on the defendant's conduct in relation to a resident plaintiff, and not the nonresident plaintiff." *McDonnell v. Nature's Way Prods., LLC*, No. 16 C 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017). Here, the only connection the Texas Claims have with Illinois is that the Illinois-resident Plaintiffs assert claims based on Defendants' same course of conduct. Otherwise, the Texas Claims arise out of non-Illinois-resident Defendants' contract to provide solid waste disposal services to JD Feldman in its state of residence, Texas.

Plaintiffs argue that, because this case is brought as a class action, the claim-by-claim analysis prescribed by the Supreme Court in *Bristol-Myers* is inapplicable. Specifically,

[2] While the *Bristol-Myers* decision concerned a case that came before the Supreme Court as a coordinated mass action, a California procedural device with no analogue in the Federal Rules of Civil Procedure, the Supreme Court stated "that its holding constituted a 'straightforward application of settled principles of personal jurisdiction.'" *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 446 (7th Cir. 2020) (quoting *Bristol-Myers*, 582 U.S. at 268).

Plaintiffs assert that post-*Bristol-Myers* Seventh Circuit precedent holds that, in class actions, once personal jurisdiction has been established as to class claims arising in the forum state, there is no need for the Court to undertake a separate jurisdictional analysis for class claims based on out-of-state conduct. However, Plaintiffs mischaracterize the precedent on which they rely. Most significantly, Plaintiffs cite *Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020), as support for their position. But in *Mussat*, the Seventh Circuit actually held that in class actions "the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Id.* at 447. The holding in *Mussat* was based on the recognition that "absent class members are not full parties to the case for many purposes." *Id.* at 447. The unique status unnamed class members occupy with respect to class action litigation underscores the importance of undertaking a "representative-focused inquiry into jurisdiction." *Vanegas v. Signet Builders, Inc.*, 113 F.4th 718, 724 (7th Cir. 2024). Consequently, *Mussat* establishes that the holding in *Bristol-Myers* applies in class actions but only as to the named plaintiffs. *See Franco v. Chobani, LLC*, No. 1:23-cv-03047, 2025 WL 1530996, at *13 (N.D. Ill. May 29, 2025) ("[T]he *Bristol-Myers Squibb* test applies only to the named plaintiffs in this suit . . . .").

With JD Feldman asserting the Texas Claims as both a named Plaintiff and proposed representative of two putative classes of Texas customers, Plaintiffs cannot evade a claim-specific jurisdictional analysis of the Texas Claims. Under that analysis, the absence of any connection between Illinois and the Texas Claims precludes this Court's exercise of specific jurisdiction over the Texas Claims. Consequently, the Court grants Defendants' Rule 12(b)(2) motion, and the Texas Claims are dismissed.

## II.     Rule 12(b)(6)

As to the Illinois claims over which this Court has personal jurisdiction, Defendants

contend that none are viable and therefore the ACAC must be dismissed for failure to state a

claim. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This

pleading standard does not necessarily require a complaint to contain detailed factual

allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728

(7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).[3]

### A.     Breach of Contract

In Count I, Plaintiffs allege that Defendants breached their contract by implementing the

YMP Rate Increases, which do not correspond to any of the Rate Adjustment Provision's bases

for increasing rates. To state a claim for breach of contract in Illinois, a plaintiff must allege: "(1)

the existence of a valid and enforceable contract; (2) substantial performance of the contract; (3)

breach of the contract; and (4) resultant damages." *Hickman v. Wells Fargo Bank N.A.*, 683 F.

Supp. 2d 779, 791 (N.D. Ill. 2010). According to Defendants, the breach of contract claim in

---

[3] Because the claims are before this Court based on its diversity jurisdiction, and the parties do not
suggest that any other state's law governs the Illinois Plaintiffs' claims, the Court evaluates the claims
under Illinois law. *E.g.*, *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) ("When a federal court sits
in diversity, we look to the choice-of-law rules of the forum state to determine which state's law applies
to the issues before it. Under Illinois choice-of-law rules, forum law is applied unless an actual conflict
with another state's law is shown, or the parties agree that forum law does not apply." (internal quotation
marks and citation omitted)).

Count I must be dismissed because the ACAC's allegations fail to show that the YMP Rate Increases were not authorized under the Rate Adjustment Provision.

Defendants emphasize that the Rate Adjustment Provision does not limit allowable rate increases only to the specific cost-justified reasons set forth in subsections (a) through (g) but also permits Defendants to increase rates for any other reason with the customer's consent. Further, such consent can be shown "verbally, in writing or by the parties' actions and practices." (ACAC ¶ 31.) According to Defendants, the ACAC focuses excessively on the lack of a cost-justified reason for the YMP Rate Increases while ignoring that the Rate Adjustment Provision's also allows rate increases by consent. They contend that, because the ACAC is silent on whether Plaintiffs consented to the YMP Rate Increases, it fails to negate the possibility that those increases were implemented with Plaintiffs' consent and thus authorized under the Rate Adjustment Provision. Put differently, Defendants argue that the ACAC fails to plead a plausible breach of the Rate Adjustment Provision by not affirmatively alleging the absence of consent for the YMP Rate Increases.

As an initial matter, the Court is perplexed by Defendants' claim that the ACAC is silent on the matter of consent for the YMP Rate Increases. The ACAC plainly alleges that Defendants did not have "consent for the YMP Rate Increases as a matter of law. [Defendants] never sought consent before imposing the YMP Rate Increases and the nature of the Rate Increases and [Defendants'] lack of disclosure regarding the calculation and true purpose of the Rate Increases makes such consent legally impossible to obtain." (ACAC ¶ 39; *see also id.* ¶ 31 n.12 ("[Defendants] never sought any customer's 'consent,' no customer 'consented' to the YMP Rate Increases, nor could any customer do so.").) Defendants fail to explain adequately why such allegations of nonconsent do not suffice.

12

Although not entirely clear, the Court understands Defendants' overarching contention to be that the ACAC does not plausibly deny that Plaintiffs evidenced their consent to the YMP Rate Increases through their conduct. Specifically, the Rate Adjustment Provision provides that consent can be shown by "the parties' actions and practices" (*id.* ¶ 31), and therefore Defendants assert that the ACAC needed to address why Plaintiffs' conduct in regularly paying the YMP Rate Increases without protest did not evidence their consent to those increases. However, the ACAC alleges that Defendants never sought consent for the YMP Rate Increases or otherwise notified Plaintiffs that they had the option to decline to pay those increases. (*Id.* ¶¶ 39–40.) And in rejecting Republic's same consent-by-conduct argument in another case, the Eighth Circuit aptly observed that, given the plaintiff's contractual right to refuse the rate increase, "it defies common sense to view [the plaintiff's] actions and practices of faithfully paying the invoices as an unambiguous manifestation of its consent to pay more voluntarily for the services it was receiving and would continue to receive under the Agreement." *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 624 (8th Cir. 2021). At minimum, whether Plaintiffs engaged in conduct that can be construed as their consent to the YMP Rate Increases presents a factual issue that cannot be resolved by means of a Rule 12(b)(6) motion. For that reason, Defendants' motion to dismiss is denied as to Count I.

## B.     Breach of the Duty of Good Faith and Fair Dealing

The claim for breach of the duty of good faith and fair dealing in Count II presents an alternative theory of breach of contract. "Under Illinois law, 'every contract contains an implied promise of good faith and fair dealing between the contracting parties,' absent express disavowal." *Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc.*, 732 F. Supp. 2d 809, 822–23 (N.D. Ill. 2010) (quoting *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003)). To establish a breach of the duty of good faith and fair dealing, a plaintiff "must show

that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *Hickman*, 683 F. Supp. 2d at 792. Thus, Count II alleges that, to the extent the Rate Adjustment Provision afforded Defendants some discretion in assessing the YMP Rate Increases, Defendants failed to exercise that discretion in good faith.

The implied duty of good faith and fair dealing "cannot override a contract's express terms." *N. Am. Elite Ins. Co. v. Menard Inc.*, 491 F. Supp. 3d 333, 339 (N.D. Ill. 2020). Rather, it only comes into play "as a 'gap-filler' where the contract is otherwise silent on how the parties are to perform certain terms of the contract." *City v. Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 769 (N.D Ill. 2019). As such, "the good-faith duty to exercise contractual discretion reasonably does not apply where no contractual discretion exists." *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004). As discussed above, the Rate Adjustment Provision plainly affords Defendants no discretion in raising rates; to the contrary, it delineates the specific circumstances in which Defendants may raise customers' rates or else requires Defendants to obtain customers' consent. Therefore, the ACAC's alternative theory of breach predicated on the duty of good faith and fair dealing cannot be maintained and Count II is dismissed as well. *See Footlick v. Topstep LLC*, No. 22 CV 6152, 2025 WL 744069, at *7 (N.D. Ill. Mar. 7, 2025) ("[W]here a separately stated breach of contract claim renders the breach of covenant [of good faith and fair dealing] claim superfluous, dismissal of the breach of covenant claim is appropriate." (internal quotation marks omitted)); *Hickman*, 683 F. Supp. 2d at 793 (dismissing claim for breach of the duty of good faith and fair dealing

because the plaintiff had "alleged an independent cause of action for breach of contract based on the same allegations").

### C. Unjust Enrichment

The ACAC contains two Counts asserting claims for unjust enrichment. Count III's unjust enrichment claim pertains to the YMP Rate Increases, and Count VI's claim is based on the Fees. As Defendants correctly note, "[i]n Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). Plaintiffs nonetheless assert that their unjust enrichment claims have been pleaded as an alternative basis for holding Republic liable if it is ultimately determined that AWT is not an alter ego of Republic. However, there exists an express contract between Plaintiffs and AWT, regardless of whether AWT and Republic effectively constitute a single entity. And that contract indisputably governs the assessment of both the YMP Rate Increases and the Fees. If Plaintiffs' alter ego theory is rejected, that just means that Plaintiffs may look only to AWT to recover for any proven overcharges. That Plaintiffs will still have an adequate remedy at law precludes their unjust enrichment claims. *See id.* ("[B]ecause it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law." (quoting *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004))). Accordingly, the unjust enrichment claims in Counts III and VI are dismissed.

### D. Fraudulent Inducement

Count VII asserts a claim for fraudulent inducement. A fraudulent inducement claim requires a plaintiff to plead: "(1) a false representation of material fact, (2) made with knowledge or belief of that representation's falsity, (3) made with the purpose of inducing another party to act or refrain from acting, and (4) the other party reasonably relied on the representation to its

detriment." *Panitz v. Veristar LLC*, No. 22-cv-5200, 2023 WL 6388232, at *3 (N.D. Ill. Sept. 29, 2023) (citing *Enter. Recovery Sys., Inc. v. Salmeron*, 927 N.E.2d 852, 858 (Ill. App. Ct. 2010)). Here, Plaintiffs allege that Defendants fraudulently induced them to pay the YMP Rate Increases and Fees without protest through their misrepresentations and omissions about the true purpose of the charges. Defendants contend that Plaintiffs' fraudulent inducement claim must be dismissed because it was not pleaded with the particularity that Federal Rule of Civil Procedure 9(b) requires of fraud claims. And even if the claims meet Rule 9(b)'s heightened standard, Defendants further argue that the ACAC fails to identify any actionable false representation concerning either the YMP Rate Increases or the Fees.

### 1.     Heightened Pleading Requirement of Rule 9(b)

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To state the circumstances of fraud with sufficient particularity, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Defendants first contend that Plaintiffs fail to plead with particularity "who" committed the purported fraud because they group Republic and AWT together as a single entity without differentiating their respective roles in the fraud. This contention, however, overlooks Plaintiffs' theory that Republic and AWT (and the now-dismissed BFI) are alter egos. Moreover, the ACAC contains extensive factual allegations in support of that theory, which make clear Republic's and AWT's respective roles with respect to the fraud. As alleged, Republic is responsible for devising and administering the YMP Rate Increases and the Fees. Republic then uses AWT and its other wholly-owned subsidiaries to impose and collect those charges from the customers with whom the subsidiaries directly contract. Thus, Plaintiffs are "not merely lumping

16

defendants together and generally complaining of their actions. Plaintiff[s] ha[ve] adequately apprised each defendant of their respective roles in the alleged scheme." *Alumax Mill Prods., Inc. v. Krzysztofiak*, No. 96 C 5012, 1997 WL 201555, at *3 (N.D. Ill. Apr. 17, 1997)

In addition, Defendants claim that the ACAC does not allege with particularity the time or place that the fraudulent representations and omissions were made. Again, the Court disagrees. The ACAC alleges that the fraud was committed against Plaintiffs each month through the monthly invoices that represented the YMP Rate Increases and Fees as mandatory charges while concealing information about their true nature and purpose, thereby causing Plaintiffs to pay Defendants sums to which they were not entitled. Such allegations adequately provide the "when," "where," and "how" required by Rule 9(b). *See, e.g., P&P Mktg., Inc. v. Ditton*, 746 F. Supp. 1354, 1363 (N.D. Ill. 1990) ("It is not necessary under [a] factual situation involving hundreds of invoices over an extended period of time to require plaintiff to describe each specific mailing . . . ."). Taken together, the Court finds that ACAC's allegations detail the purported fraud with the particularity required by Rule 9(b).

## 2.    YMP Rate Increases

On the merits, Defendants argue that the Court should reject Plaintiffs' attempt to recast into a fraud claim the ACAC's allegations of breach of contract based on the YMP Rate Increases. Under Illinois law, "a fraud claim cannot rest on the same ground as a claim of breach of contract." *Five-Star AudioVisual, Inc. v. Unique Bus. Sys. Corp.*, 769 F. Supp. 3d 840, 852 (N.D. Ill. 2025). Put differently, "'a breach of contractual promise, without more, is not actionable' . . . under a theory of common law fraud." *GuideOne Mut. Ins. Co. v. Good Shepherd Lutheran Church*, No. 20 CV 4730, 2021 WL 3077658, at *4 (N.D. Ill. 2021) (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005)). Instead, where fraud is pleaded in a contractual setting, a plaintiff must "identify [a] fraudulent act distinct from the alleged

breach of contract." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011); *see also GuideOne*, 2021 WL 3077658, at *4 ("In a contractual setting, a plaintiff pleading fraud must show more than 'the mere fact that a defendant promised something and then failed to do it.'" (quoting *Avery*, 835 N.E.2d at 844)).

At first glance, the ACAC's fraud claim based on the YMP Rate Increases does resemble the paradigmatic example of a converted breach of contract claim—"where an event giving rise to a breach of contract claim at the same time gives rise to a claim of fraud." *Automobili Lamborghini Am. LLC v. Gold Coast Exotic Imports, LLC*, No. 24 C 00162, 2024 WL 4367795, at *4 (N.D. Ill. Sept. 30, 2024). That is, the claim that Plaintiffs were fraudulently induced to pay the YMP Rate Increases arises out of the same allegations that give rise to the claim in Count I that Defendants' implementation of the YMP Rate Increases contravenes the Rate Adjustment Provision. And moreover, the allegedly fraudulent misrepresentations on the invoices, *i.e.*, the assessment of the YMP Rate Increases, are also the acts constituting the alleged breach of contract.

Yet courts have recognized that "[w]here a defendant creates a façade of compliance in order to frustrate the plaintiff's abilities to enforce a contract . . . the conduct goes beyond breach of contract and becomes indicative of fraud." *Id.* at *5 (internal quotation marks omitted). Certainly, Plaintiffs suggest that such a façade of compliance was at play here—since they claim that the YMP Rate Increases were made to appear mandatory in the monthly invoices and customers were provided no information identifying their purpose or notice that they could decline to pay the charges. But even in cases asserting a façade of compliance, the plaintiff also has pleaded that the façade was accompanied by "a series of dilatory, deceptive and punitive maneuvers designed to mask that non performance" of the defendant's contractual obligations.

*Id.* (internal quotation marks omitted). By contrast, here, the ACAC's allegations show only that Defendants implemented the YMP Rate Increases and passively allowed Plaintiffs to believe that the YMP Rate Increases were mandatory without taking affirmative measures to disguise the increases' lack of justification under the Rate Adjustment Provision. Such allegations fail to elevate the breach of contract claim into one for fraud. *See New Park Manor, Inc. v. N. Pointe Ins. Co.*, No. 13 C 4537, 2013 WL 5408856, at *6 (N.D. Ill. Sept. 26, 2013) (finding that the plaintiff failed to plead conduct elevating a breach claim into fraud, distinguishing the circumstances there from another case where the defendant "pretended to comply with its contractual obligations, repeatedly made unreasonable and irrelevant demands as a delay tactic, and engaged in behavior designed to mask its deceptive acts").

In sum, the Court finds the ACAC devoid of allegations that meaningfully distinguish its claim for fraud based on the YMP Rate Increases from Count I's breach of contract claim based on those charges. For that reason, the fraud claim arising out of the YMP Rate Increases cannot be maintained.

### 3. Fees

Because the breach of contract claim in Count I is based only on the YMP Rate Increases, Defendants cannot also obtain dismissal of the Fees-based fraud claim as a refashioned breach of contract claim. Thus, Defendants also argue that their assessment of the Fees involved no misrepresentation at all.

Notably, Defendants' contracts with Plaintiffs contain language expressly authorizing Defendants to assess the Fees. Specifically, the standardized contractual language includes a term under which the customer is required to pay "fuel/environmental recovery fees in the amount shown on each of Company's invoices, which amount Company may increase or decrease from time to time by showing the amount on the invoice." (Defs.' Mot. to Dismiss, Ex.

E, Hermitage of Ravenswood Condominium Association Contract, Dkt. No. 23-5.[4]) That language authorizes Defendants to assess the Fees and allows them to increase the Fees simply by showing the increased sum on the invoice. Moreover, the ACAC does not deny that the Fees conspicuously appear as a line item on Plaintiffs' monthly invoices.

Beyond the "fuel/environmental recovery" label applied to the Fees, Plaintiffs point to no representation on the part of Defendants regarding the purpose underlying those Fees or how they are calculated. Nor do Plaintiffs cite any provision in their contracts limiting the amount by which Defendants can raise (or lower) the Fees on a month-to-month basis. While Plaintiffs might reasonably assume that "fuel/environmental recovery fees" bear some relationship to Defendants' fuel and environmental recovery costs, the label affixed to the Fees, by itself, is not a misrepresentation that gives rise to fraud. *See Deere Constr., LLC v. Cemex Constr. Materials Fla., LLC*, No. 15-24375-CIV-KING, 2016 WL 2770537, at *3 (S.D. Fla. May 12, 2016) ("The Complaint merely states that the terms 'fuel surcharge' and 'environmental surcharge' appear as line items on invoices which Plaintiff paid, then goes on to conclude that the terms themselves 'characterize' the surcharges as something other than what they actually are. However, the Complaint contains no factual allegations which support Plaintiff's subjective belief, and the Court finds nothing about the terms themselves which compel the conclusions about them which Plaintiff has drawn."); *Braswell Wood Co. v. Waste Away Grp., Inc.*, No. 2:09-CV-891-WKW [WO], 2010 WL 3168125, at *4 n.2 (M.D. Ala. Aug. 10, 2010) ("[I]t [is] difficult to understand how simply charging fees with names such as 'fuel surcharge,' and 'environmental fee,' or

---

[4] While the ACAC does not quote or otherwise reference this language or include the contracts as exhibits, the contracts are central to Plaintiffs' claims and therefore are properly considered in their entirety in connection with the Rule 12(b)(6) motion. *E.g.*, *Nationwide Agribusiness Ins. Co. v. USG Corp.*, 713 F. Supp. 3d 503, 509 (N.D. Ill. 2024).

'landfill surcharge' could constitute fraudulent misrepresentations, given that those terms, and how they should be calculated, are not specifically defined in the contract . . . ."). The contracts labeled the fees as "fuel/environmental recovery fees" but otherwise made no representations about them.

In short, per the contractual language, Defendants reserved the right to assess the Fees and to increase them from time-to-time, and therefore they did not commit fraud by merely enforcing their contractual right to collect the Fees. Because Count VII fails to state a claim for fraud based either on the YMP Rate Increases or the Fees, it is dismissed in full.

### E. ICFA

In Count IV, the ACAC alleges that Defendants' implementation of the YMP Rate Increases violates the ICFA. Similarly, Count V asserts an ICFA claim based on Defendants' assessment of the Fees. The ICFA's purpose is "to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). The elements of an ICFA claim include: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). An ICFA claim may be predicated on either deceptive or unfair conduct. *Robinson*, 775 N.E.2d at 960. Plaintiffs' ICFA counts allege both forms of conduct.

### 1. Deceptive Acts or Practices

To the extent Plaintiffs' ICFA claims are predicated on deceptive conduct, they fail for the same reasons that their fraud claims fail. Under the ICFA, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*,

246 F.3d 934, 938 (7th Cir. 2001). First, the YMP Rate Increases cannot support a deceptive act

or practice because, as with the common-law fraud claim, an ICFA claim "requires something

more than a garden-variety breach of contract." *Greenberger*, 631 F.3d at 399. Second, given

that Plaintiffs' contract expressly disclosed that the Fees would be charged and made no

representations about their purpose, Defendants did not commit a deceptive act by including the

Fees as an itemized charge on Plaintiffs' monthly invoices. *See e.g.*, *Vorst v. TBC Retail Grp.,*

*Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing a state-

law deceptive acts or practices claim based on the defendant's charge of an oil disposal fee

where "[t]here is nothing in the invoice . . . which indicates that the $3.00 oil disposal fee was

represented to be a pass-through expense"); *cf. State Mech. Servs., LLC v. NES Equip. Servs.*

*Corp.*, No. 17-cv-5950, 2018 WL 2193248, at *3 (N.D. Ill. May 14, 2018) (holding that "even if

the environmental fee has no connection to Defendants' environmental costs, Defendants did not

breach any contractual duty by charging the fee" because the contract provided "that Defendants

charge a per item, per invoice fee ***for*** handling waste fluids" not that "the environmental fee

corresponds to Defendants' costs for handling waste fluids").

### 2.    Unfair Acts or Practices

The Court next turns to the question of whether the ACAC adequately pleads that

Defendants' conduct in assessing the YMP Rate Increases and the Fees was unfair. Unlike an

ICFA claim based on deceptive acts or practices, which must be pleaded in accordance with Rule

9(b)'s heightened standard, an unfair conduct claim is governed only by the notice pleading

standard of Federal Rule of Civil Procedure 8(a). *Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th

Cir. 2024). To determine whether an alleged practice is unfair for purposes of the ICFA, a court

considers the following three factors: "(1) whether the practice offends public policy; (2)

whether it is immoral, unethical, oppressive, or unscrupulous; and/or (3) whether it causes

22

substantial injury to consumers." *Id.* at 602 (internal quotation marks omitted). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961 (internal quotation marks omitted).

Here, drawing all reasonable inferences in Plaintiffs' favor, the Court is satisfied that both the YMP Rate Increases and the Fees are sufficiently oppressive and unscrupulous as to support unfair conduct claims for both. "Conduct is immoral, unethical, oppressive, or unscrupulous for ICFA purposes if it 'leaves the consumer with little choice except to submit to it.'" *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 715 (N.D. Ill. 2018) (quoting *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018)). First, the YMP Rate Increases and the Fees are both the alleged vehicles that Defendants use to render essentially illusory the contractual limits on their ability to raise Plaintiffs' rates. As discussed above, the YMP Rate Increases are presented to Plaintiffs and other customers as mandatory, with no disclosures about their purpose or notice that they are optional under the Rate Adjustment Provision. While the Fees are contractually authorized, the contracts themselves appear to give Defendants free reign to increase the fees each month. In that way, Plaintiffs allege, Defendants know at the time they execute their contract "with a customer that the customer will pay substantially more than the agreed upon service rate through [the] Fees." (ACAC ¶ 46.) Put differently, Defendants use the Fees "as a hidden price increase." (*Id.* ¶ 3.)

At the same time that Defendants allegedly use YMP Rate Increases and the Fees as license to raise their customers' prices with impunity, Defendants' contracts have standardized provisions locking Plaintiffs into a 3-year initial term and authorizing Defendants to impose punitive measures against customers who try to terminate the contract early or fail to pay amounts that Defendants deem to be owing. (*Id.* ¶ 34); *see, e.g.*, *Wendorf v. Landers*, 755 F.

23

Supp. 2d 972, 980 (N.D. Ill. 2010) ("A crucial aspect of [the plaintiffs' unfairness] allegation is that they could not avoid the charge by terminating their contract because of the 60-day notice requirement for cancellation."). Plaintiffs further allege that Defendants invoke the contractual provision entitling the prevailing party in litigation to recoup their attorneys' fees and costs to dissuade customers from litigating the propriety of the YMP Rate Increases or Fees. (ACAC ¶ 53); *see, e.g.*, *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991) ("[W]e find that defendants were in a superior bargaining position and used intimidation to collect payment; this we find to be unethical."). These allegations sufficiently state claim that Defendants' customers face an "unreasonable burden" in opposing the YMP Rate Increases and the Fees. *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008) ("Conduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target."); *see also Wendorf*, 755 F. Supp. 2d at 979 ("Courts interpreting the meaning of 'unfair practices' have held that a plaintiff states a claim under the ICFA where the defendant's conduct gave plaintiff no reasonable alternative to avoid incurring a charge or penalty."). Moreover, Plaintiffs have plausibly alleged that customers face a substantial injury from Defendants' practices, as the YMP Rate Increases can result in their rates ballooning to twice the originally contracted rate by the end of the contractual term, and the Fees add hundreds of dollars to their monthly bill. (ACAC ¶¶ 37, 41.)

Accordingly, the Court is satisfied that the ACAC adequately pleads that Defendants act oppressively in implementing the YMP Rate Increases and assessing the Fees, and that their conduct causes substantial injury to Plaintiffs. Consequently, the ICFA claims in Counts IV and V may proceed insofar as they are predicated on Defendants' allegedly unfair acts or practices.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 23) is granted in part and denied in part. The Texas Claims are dismissed for lack of personal jurisdiction; these include all claims brought by Plaintiff JD Feldman and those against Defendant BFI. With respect to the claims brought by Plaintiffs Albany Condominium Association and Hermitage of Ravenswood Condominium Association, Counts II, III, VI, and VII are dismissed without prejudice for failure to state a claim. The claims in Counts IV and V under the ICFA are also dismissed without prejudice for failure to state a claim, so far as those claims are based on deceptive acts or practices; those claims survive so far as they are based on alleged unfair acts or practices. The motion is denied as to Count I. Plaintiffs will be granted an opportunity to file an amended complaint that remedies the pleading deficiencies of those claims dismissed for failure to state a claim.

ENTERED:

Dated: September 15, 2025

_____
Andrea R. Wood
United States District Judge